UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
TAMON EDWARDS,

                              Plaintiff,                         **MEMORANDUM & ORDER**

                - against -                                     21-CV-1670 (PKC) (SIL)

COUNTY OF NASSAU, GREGORY
BERNHARDT, BASIL GOMEZ, MICHAEL
MAZZARA, DAVID O'CONNOR, and
MICHELLE THOMAS,

                              Defendants.
------------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

      Plaintiff Tamon Edwards brings this suit pursuant to 42 U.S.C. § 1983 against Defendants

County of Nassau, Gregory Bernhardt, Basil Gomez, Michael Mazzara, David O'Connor, and

Michelle Thomas (collectively, "Defendants").   Defendants move to dismiss the operative

complaint.   For the reasons below, Defendants' motion to dismiss is granted in its entirety.

## BACKGROUND

### I.    Factual Background

      The Amended Complaint alleges the following facts, which the Court accepts as true for

purposes of this motion, *see Dane v. UnitedHealthcare Ins. Co.*, 974 F.3d 183, 188 (2d Cir. 2020),[1]

except to the extent the Amended Complaint includes "general allegations that are contradicted by

more specific allegations," *see DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d

145, 151–52 (2d Cir. 2014).

---

[1] Unless otherwise noted, all legal citations in this Memorandum and Order omit any
internal quotation marks, citations, brackets, and ellipses.

A.      **Underlying Events**

Plaintiff Tamon Edwards is a resident of Queens County, New York. (Amended Complaint ("Am. Compl."), Dkt. 14, ¶ 6.) Plaintiff worked for Delta Ground Services at John F. Kennedy International Airport in 2017. (*Id.* ¶ 30.) During that time, he became friends with a coworker, Darren Gopaul. (*Id.* ¶ 31.) Gopaul began dating a woman named Keyonna Condison, who was a student at the C.W. Post campus of Long Island University. (*Id.* ¶¶ 32–33.) Gopaul thereafter "invited [Plaintiff] to hang out with him and Condison at Condison's dorm because Condison's friend, Elena Wilson, would also be there." (*Id.* ¶ 33.) Plaintiff and Wilson began dating. (*Id.* ¶ 34.) They went on three dates within three weeks. (*Id.*) At that point, "Wilson cut off the relationship and blocked [Plaintiff] from contacting her on her phone." (*Id.*) Plaintiff "attempted to contact Wilson on another number to ask why she had blocked him, but did not receive a response." (*Id.* ¶ 35.) Plaintiff "did not contact Wilson again." (*Id.*)

On September 27, 2017, Gopaul texted Plaintiff, in reference to Wilson, that he was going to "bring this thot[2] down . . . I'm about to spam her phone . . . [w]ith so much fake number[.]" (*Id.* ¶ 36 (alterations in Amended Complaint).) Plaintiff replied, "Oh god she gonna think it's me[.]" (*Id.* ¶ 37 (alterations in Amended Complaint).) A few days later, Gopaul texted Plaintiff: "I ain't lying . . . I told you . . . I'm destroying her" (*id.* ¶ 39 (alterations in Amended Complaint)); and "I say we kidnap her"—to which Plaintiff replied with a "GIF"[3] that said, "Screw You," and

---

[2] The Court assumes this is a reference to the slang term for "a woman considered to be sexually provocative or promiscuous; a slut or whore." Thot, DICTIONARY.COM, https://www.dictionary.com/browse/thot (last visited Mar. 29, 2022).

[3] "GIF, which stands for "graphics interchange format," is a "digital file format devised in 1987 by the Internet service provider CompuServe as a means of reducing the size of images and short animations." ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/technology/GIF (last visited Mar. 29, 2022).

a text that said, "[What the fuck] would that do[?]"—(*id.* ¶ 40 (alterations in Amended Complaint)).

A few months later, on January 26, 2018, Gopaul sent texts to Plaintiff, stating "Elena's . . . [b]lamed me and you . . . [f]or fake texting [her and Condison]"; and "I wanna shoot this botch son"—to which Plaintiff replied that he was not texting Wilson and did not care. (*Id.* ¶¶ 42–43 (alterations in Amended Complaint)). Gopaul also texted that "[t]hey threatening to call cops on us . . . I wanna slap her down son[.]" (*id.* ¶ 44 (alterations in Amended Complaint)). Plaintiff responded, "I ain't texing her . . . [s]he blocked on my phone . . . [i]f she does they gonna do a trace of the number and find it ain't me[.]" (*Id.* ¶ 45 (alterations in Amended Complaint).) Gopaul then sent Plaintiff the following texts: "I'm telling u we need a dump her body In the lake [] And call it a day [] I know there door room codes [] … [] Yo [] I cud end Elena and keyonna if I wanted too [] But they threatening to call cops [] Which is sad … [] I cud ruin eleana especially [] I got her LIU account [] … [] I can drop all her classes and make her have to pay the 26k Tuition instead of financial aid [] That's how bad it can get." (*Id.* ¶ 46 (brackets representing line breaks).)

## B. Witness Reports

On March 9, 2018,[4] Condison appeared at the C.W. Post Campus of Long Island University Department of Public Safety ("LIU Safety Department") and gave the following statement:

> I met Tayemon Edwards through my [ex-]boyfriend, Darren [G]opaul around May 2017. Taemon + a friend of mine, Eleaina Willson [b]riefly dated. She stopped talking to him and around late June he decided to take vengeance upon me, my ex[-]boyfriend, and anyone else in my circle he could reach. He has been sending

---

[4] The Amended Complaint lists this date as March 9, *2019*. (*See* Am. Compl., Dkt. 14, ¶ 47. But because the events alleged in this paragraph follow from events that allegedly occurred in January 2018, and precede events that allegedly occurred in April 2018, the Court assumes that "2019" is supposed to say "2018." Further, as reflected in the message printed below, Condison said "I would also like to add that as of March 5th I have been withdrawn [f]rom all of my 2018 Spring classes." (*Id.* ¶ 50.)

> threatening/malicious text messages to my ex, spam texting me from several
> different numbers, hacking into my T-mobil account, impersonating me, and
> amongst many other things, he was stalking me, following me on and off campus
> in his car. Most recently, it has come to my attention that I have been withdrawn
> from all of my classes and I have reason to believe that it is him that has done it.

(*Id.* ¶ 47 (alterations in Amended Complaint and typographical errors in original).)

Ten days later, on March 19, 2018,[5] Condison appeared at the Old Brookville Police

Department and gave the following statement:

> [O]ver the past several months beginning in August of 2017, I have received phone
> calls and text messages [f]rom several different phone numbers harassing me.
> These messages have been sent to me both directly and indirectly through my
> friends and boyfriend. I believe the person responsible is Tayemon Edwards. My
> boyfriend and I had set this individual up with a friend of mine in May of 2017.
> When the situation did not work out I began receiving these messages to my phone
> shortly after. These text message statements included "Now I'm going to make yuh
> really feel the agony of losing everythin" I also recently found out that my T-Mobile
> acct was hacked on 3/18/18, when an individual attempted to impersonate me
> and hack my phone to [d]eactivate the acct. I did not give anyone permission to use
> my acct. I would like this person arrested for aggravated harassment... At this time
> I would also like to add that as of March 5th I have been withdrawn [f]rom all of
> my 2018 Spring classes, which I did not give anyone permission or authority to
> withdraw me [f]rom.

(*Id.* ¶ 50 (alterations in Amended Complaint and typographical errors in original).)

On April 9, 2018, Wilson appeared at the LIU Safety Department and gave the following

statement:

> I have recently been receiving threatening text messages from an individual who I
> used to associate with. I've been told that a bullet will be put in my head the next
> time he sees me at work, which means he has been stalking me at my new job
> (secrets) bar & lounge. I have not seen this man (Tamon Edwards) since May of
> 2017 and am just now receiving threatening messages about my life and how my
> school account is going to be hacked by the end of the week if I don't respond.
> Keyonna Condison has received threats for the past three months. To the point
> where she had to move to another building on campus.

---

[5] The Amended Complaint again says "2019." For the reasons discussed, *see supra* note
4, the Court assumes this paragraph is supposed to say "2018."

(*Id.* ¶ 56.)

On April 10, 2018, Wilson gave the following statement to officers at the LIU Safety Department, with members of the Old Brookville Police Department present:

> I . . . am present . . . to report a threatening text message. On April 9th 2018 at about 8:35 p.m. I received a text message from the phone number (347) 974-6152 threatening to put a bullet in my head at 'Secrets' which is a club in Queens. I also received text messages from this number threatening to drop my college classes. These messages case me annoyance and alarm and place me in fear for my safety. I believe that these messages are coming from a friend of a friend Tamon Edwards from Queens . . . I request an arrest be made for sending these messages.

> (*Id.* ¶ 58 (alterations in Amended Complaint and typographical errors in original).)

Plaintiff alleges that "the individual defendants received information about the foregoing allegations, including receiving copies of the foregoing statements made by Condison and Wilson." (*Id.* ¶ 59.)

On April 10, 2018, Condison appeared at the Nassau County Police Department ("NCPD"), and Defendant Bernhardt recorded the following statement:

> [On January 28, 2018,] at about 8 PM I, Keyonna E. Condison, was driving in my zip car that I rented thru C W Post College in the parking lot of Shah's Halal Food Restaurant, located at 285 S. Broadway, #5 store, Hicksville, New York, after I got something to eat and was preparing to drive back to my dorm room at W.W. Post. The zip care that I rented was a silver Ford automobile. Anyway, as I was halfway backed out of my parking stall trying to leave the parking lot, a light colored car sped up from out of nowhere and almost crashed into my car in order to perpendicularly block me into my parking stall. The car didn't move for almost a minute and I was already afraid for my safety so I honked in hopes that the car would move but it didn't, so I looked to see who was driving the car and I saw that it was Tamon Edwards. I know Tamon Edwards because I met him thru my boyfriend at the time, Darren Gopaul. They were friends so we all hung out once or twice and I saw him and we spoke several other times as well. The first time I met him was at the end of April 2017 when we all hung out for the night. Anyway, after about another half of a minute or so, he finally sped off. I was very fearful for my safety and my life once that I saw that it was Tamon because between November 17, 2017 and January 28, 2018, I had received three text messages threatening to ruin my life and break up my relationship with Darren, and Darren had told me that when I went on a cruise vacation w/ my family in August of 2017 Tamon was repeatedly telling him that I was cheating on him, and that I was no good and that

he should leave me, so I was already keen to the fact that Tamon didn't want his friend, and my boyfriend at the time, Darren, to keep dating me. Then, beginning on January 30, 2018 and April 10, 2018 I received approximately one hundred and fifty text messages that I know were from Tamon Edwards because he made numerous references about my friend Eleaina Wilson and wanting an apology from her and I, and that if we [apologize] that he would stop texting us, hacking into my email accounts and my cell phone account w/ T-Mobile, which I had to change my telephone number twice due to his threatening messages. I am the one who set up Eleaina Wilson and Tamon Edwards in early May of 2017. They dated for a short time before Eleaina broke up with Tamon, and Darren said that he took the breakup hard, so I know it has been Tamon Edwards sending me these numerous text messages and I am very annoyed, alarmed, and very fearful for my physical safety. I did not give Tamon Edwards permission or authority to threaten my physical safety in his vehicle or to harass, annoy, and threaten me and put in fear for my physical safety by sending at least one hundred and fifty text messages to me and further, if caught I want him arrested. Detective Bernhardt has written this statement for me and I have read it and it is the truth. I want to add that today April 10, 2018 at 1:50 pm he sent me a text message that said "Ima put a bullet in yuh head. soon come. Let me catch u outside Brookville." and I am now very afraid for my life.

(*Id.* ¶ 61 (alterations in Amended Complaint and typographical errors in original).)

On April 11, 2018, Wilson appeared at the NCPD, and Defendant Thomas recorded the

following statement in writing:

I met this guy Tamon Edwards through a friend from school Keyonna Condison who was dating Darren at the time. They both decided to hook me up to go on a date with Tamon Edewards. I went of a few dates with him it was nothing sexual, I thought he was nice but I wasn't attracted to him. I told Keyonna and Darren that I wasn't interested and they encouraged me to continue seeing him and ~~use~~ not use him for material things and to get cheap flights I told them I couldn't do it I feel bad, but one day I was hanging out with Keyonna and she was telling me to use Tamon to get something to eat so I reached out to him and asked him to get me some pizza which he did. Soon after I blocked him from my phone and social media. After that I didn't hear from him this happened around May of 2017. Then 2 months ago I found out from Keyonna that Tamon was stalking and threatening her. On March 15, 2018 I received a a text from (305) 946-1622. It said "Hey you busy?" I texted "Who's this" "Tell ur little friend that I don't want to fuck her thot ass n to stop tellin me n trey." I replied "Who is my little friend" he replied "also I made her who she is" I replied "How you made her? Who you talking about?" he said "No that what she said to us about you lml." I replied "what she said" he replied "I want an apology" "So u don't wanna answer meh" I know were u live bitch". I showed Keyonna these messages and she told me it was from Tamon Edwards. At that time I did not think anything of it . . . April 9th around 8:35 . . . messages from

6

a (347) 974-6152 which said "When I see u at secrets… Im putting a bullet in toh head feels meh? Better hop I don't see you" I replied "who is this" He replied "u played me before don't u remember Riggs 215" Riggs 215 is the dorm numbers at school. Then he text "why did u do it?" "If u don't respond I'll drop ur classes before the weeks end like I did to the light skin dyke & keke, one by one" "keke has a bigh mouth & doesn't know when to shup up. It's cuase of her doing this now". By Keke he is referring to Keyonna. I immediately made a police report because I was in fear for my safety. Then on April 10th, 2018 at 2:05 am I received another text from a (516) 953-4040 which stated "Wait till I see u or key ima gunna put a bullet in ya heads on some real shit. I know ur schedule. Got class early huh. I'm tired of this bich key. She made it game over for you. Told me it was u who made up the whole idea of plain me. Now its clip 4 u cuz she said that. It's u, Daren, Key & whoever else I decide to clip. Soon come if you don't reply, I got ur answer that this true wat she said." I then notified public safety and made another police report because I am in fear for my safety. I ~~believed~~ know that these text messages are from Tamon Edwards because of the way he's saying in the text and I saw similar text messages that . . . sent to Keyonna. I am in fear for my safety and I want him arrested. I am giving this statement to Detective Thomas who wrote it for me and it is the truth.

(*Id.* ¶ 63 (alterations in Amended Complaint and typographical errors in original).)

### C.   Plaintiff's Arrest

At approximately 2:00 p.m. on April 11, 2018, Defendants Mazzara and Gomez drove to Plaintiff's home in Queens, arrested him, and searched him. (*Id.* ¶ 67.) On the way to the precinct, Plaintiff consented to a search of his cell phone. (*Id.* ¶ 70.) According to the Amended Complaint, Defendants "knew" after searching Plaintiff's phone "that the only phone number associated with [Plaintiff's] phone was (718) 593-1727." (*Id.* ¶ 72.) Defendants also found the texts Gopaul had sent Plaintiff. (*Id.* ¶ 74.)

The individual defendants informed the Nassau County District Attorney's Office that Plaintiff had violated New York Penal Law §§ 120.45(1) (stalking in the fourth degree) and 240.30(1)(a) (aggravated harassment in the second degree). (*Id.* ¶ 80.) The Nassau County District Attorney's Office sent two Informations to Defendant Bernhardt, which he signed. (*Id.* ¶¶ 81–82.)

### D.    Plaintiff's Prosecution

The individual Defendants forwarded the "Informations, arrest reports, complaint reports, domestic incident reports, and witness/victim statements" to the Nassau County District Attorney's Office.  (*Id.* ¶ 88.)  According to Plaintiff, these Defendants did not forward the "the text messages from Gopaul; the true statements of Wilson and Condison; [Plaintiff's] cell phone; and the fact that they had recovered a camera outside of the dorm that did not have [Plaintiff's fingerprints]." (*Id.* ¶ 89.)

Also according to Plaintiff, during the course of the prosecution, he produced evidence that he was at work on January 28, 2018, at 8:00 p.m., when he was alleged to have stalked Condison in his car.  (*Id.* ¶ 90.)  The prosecutor also received copies of Gopaul's text messages to Plaintiff about retaliating against Wilson and Condison.  (*Id.* ¶ 91.)  Plaintiff alleges that "after receiving this information, the Nassau County District Attorney's Office contacted Condison[,] who admitted that she had never observed Mr. Edwards on January 28, 2018; did not know that it was, in fact Mr. Edwards who had sent her text messages and hacked into her accounts; and that it was Defendant Bernhardt who had drafted those allegations and had her sign it so that [Plaintiff] could be arrested."  (*Id.* ¶ 92.)  Plaintiff further alleges that "the Nassau County District Attorney[']s[] Office also contacted Wilson, who conveyed similar information to them, namely that she did not, in fact, know that Mr. Edwards was the person behind the allegations contained in her purported statement and that Defendant Thomas had drafted the allegations and had her sign it so that Mr. Edwards could be arrested."  (*Id.* ¶ 93.)

On August 1, 2018, Plaintiff accepted an adjournment in contemplation of dismissal ("ACD"), and the aggravated harassment charge was dismissed.  (*Id.* ¶ 95.)  On January 31, 2019,

Plaintiff "was made to appear at the Nassau County District Court, at which time the charges were dismissed and sealed." (*Id.* ¶ 96.)

## II.       Procedural Background

On March 29, 2021, Plaintiff filed a complaint in this Court against Defendants Nassau County, Bernhardt, Gomez, Mazzara, O'Connor,[6] and Thomas. (*See* Dkt. 1.) On April 14, 2021, Defendants sought a pre-motion conference (*see* Dkt. 12), and Plaintiff responded by requesting leave to amend the complaint (*see* Dkt. 13). The Court granted Plaintiff's request, and, on May 21, 2021, Plaintiff filed the Amended Complaint, alleging, pursuant to 42 U.S.C. § 1983, (1) unlawful stop and search, (2) false arrest, (3) fabrication of evidence, (4) malicious prosecution, (5) failure to intervene, and (6) municipal liability under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). (*See* Am. Compl., Dkt. 14.) On May 25, 2021, Defendants moved for a pre-motion conference in anticipation of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). (*See* Dkt. 15.) The Court set a briefing schedule on the proposed motion to dismiss, which was fully briefed on August 5, 2021. (*See* 6/9/2021 Docket Order; Dkts. 19, 20.)

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw   the   reasonable   inference   that   the   defendant   is   liable   for   the   misconduct

---

[6] The Amended Complaint contains no specific allegations against O'Connor.

9

alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556).  The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  In addressing the sufficiency of a complaint, a court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Hamilton v. Westchester County*, 3 F.4th 86, 90–91 (2d Cir. 2021).  And "[a]lthough factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint." *See DPWN Holdings (USA), Inc.*, 747 F.3d at 151–52.

## DISCUSSION

### I.  42 U.S.C. § 1983

Section "1983 does not confer any substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Village of Freeport v. Barrella*, 814 F.3d 594, 600 n.8 (2d Cir. 2016).  "To state a claim under § 1983, a plaintiff must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014).

### II.  False Arrest

Plaintiff alleges that Defendants deprived him of his Fourth and Fourteenth Amendment rights by arresting him without probable cause.

A.       **Legal Standard – False Arrest**

"Claims for false arrest brought under Section 1983 are substantially the same as claims for false arrest under state law." *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021). "Under New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.*

"Probable cause is a complete defense to a constitutional claim of false arrest . . . ." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Id.* "More specifically, probable cause exists if a law enforcement officer received information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Id.*; *see also Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity.").

"[T]he probable-cause-to-arrest inquiry is generally limited to whether the facts known by the arresting officer at the time of the arrest objectively provide probable cause to arrest." *United States v. Pabon*, 871 F.3d 164, 176 n.5 (2d Cir. 2017). "If [police officers] arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable merely because it later turns out that the complaint was

11

unfounded." *Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002).  But "if a defendant knows that witness statements are false or coerced, this will defeat probable cause." *Bouche v. City of Mount Vernon*, No. 11-CV-5246 (SAS), 2013 WL 322613, at *6 (S.D.N.Y. Jan. 28, 2013).

"Questions of historical fact regarding the officers' knowledge at the time of arrest are to be resolved by the jury." *Dufort v. City of New York*, 874 F.3d 338, 348 (2d Cir. 2017).  "However, where there is no dispute as to what facts were relied on to demonstrate probable cause, the existence of probable cause is a question of law for the court." *Id.*

"Even in the absence of probable cause, a police officer is entitled to qualified immunity where (1) her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for her to believe that her actions were lawful at the time of the challenged act." *Frost v. N.Y.C. Police Dep't.*, 980 F.3d 231, 243 n.8 (2d. Cir. 2020).  "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest—that is, if officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 157 (2d Cir. 2013).  "However, 'arguable' probable cause should not be misunderstood to mean 'almost' probable cause.  If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." *Id.*

### B.     Plaintiff Fails to Adequately Plead False Arrest

Defendants Mazzara and Gomez arrested Plaintiff for stalking in the fourth degree under New York Penal Law § 120.45(1) and aggravated harassment in the second degree under New

York Penal Law § 240.30(1)(a).[7]  (Am. Compl., Dkt. 14, ¶¶ 67, 80, 83.)  "A person is guilty of stalking in the fourth degree when he or she intentionally, and for no legitimate purpose, engages in a course of conduct directed at a specific person, and knows or reasonably should know that such conduct . . . is likely to cause reasonable fear of material harm to the physical health, safety or property of such person, . . . or a third party with whom such person is acquainted."  N.Y. Penal Law § 120.45(1).  "A person is guilty of aggravated harassment in the second degree when," with "intent to harass another person, the actor . . . communicates, [by various means], a threat to cause physical harm to, or unlawful harm to the property of, such person, . . . and the actor knows or reasonably should know that such communication will cause such person to reasonably fear harm to such person's physical safety or property . . . ."  *Id.* § 240.30(1)(a).

Plaintiff does not contest that Defendants' "knowledge of, or reasonably trustworthy information as to, [the] facts and circumstances" asserted in Condison's and Wilson's statements would be "sufficient to warrant a person of reasonable caution in the belief that" Plaintiff had violated Sections 120.45(1) and 240.30(1)(a).  *See Betts*, 751 F.3d at 82.  Although Defendants Bernhardt and Thomas drafted the statements, both Condison and Wilson affirmed that the statements were true.  Condison attested: "Detective Bernhardt has written this statement for me and I have read it and it is the truth."  (Am. Compl., Dkt. 14, ¶ 61.)  Wilson similarly attested: "I am giving this statement to Detective Thomas who wrote it for me and it is the truth."  (*Id.* ¶ 63.)  Significantly, both Condison and Wilson signed their statements.  (*See id.* ¶¶ 92 (Condison), 93 (Wilson).)  Plaintiff does not allege that Condison or Wilson lacked, or appeared to lack, capacity

---

[7] As discussed below, while Defendants Mazzara and Gomez arrested Plaintiff, his false arrest claim is based on allegations that Defendants Bernhardt and Thomas fabricated the statements of Wilson and Condison, with which Mazzara and Gomez played no role.

to sign, that Defendant Bernhardt or Thomas coerced them to sign,[8] or that those Defendants forged their signatures. Because police officers may "arrest a person on the basis of a private citizen's complaint that if true would justify the arrest," even if "it later turns out that the complaint was unfounded," the only question is whether Defendants "*reasonably believe*[*d*] [the statements were] true." *Loria*, 306 F.3d at 1283 (emphasis added).[9]

Plaintiff argues that Defendants Bernhardt and Thomas "fabricated" the statements and thus, by implication, did not reasonably believe that the statements were true. First, Plaintiff argues that Condison's "statement omitted the fact that the text messages allegedly sent by Mr. Edwards were sent from unknown/anonymous phone numbers." (Plaintiff's Opposition to Defendants' Motion to Dismiss ("Pl. Opp."), Dkt. 20, at 2.) Plaintiff seems to suggest that Defendant Bernhardt knew the texts came from anonymous numbers, but omitted that fact when he drafted Condison's statement, because the anonymity would have undermined probable cause.

As noted, however, Condison and Wilson adopted their statements, so Condison and Wilson are responsible for the statements' content and omissions. And in any event, the fact that the texts came from anonymous phone numbers would not have defeated probable cause, so the omission of that fact was inconsequential.[10] In her statement to Defendant Bernhardt, Condison

---

[8] Though, as discussed *infra*, Plaintiff alleges that Defendants Bernhardt and Thomas drafted Wilson's and Condison's statements and had the two sign them "so that Mr. Edwards could be arrested" (Am. Compl., Dkt. 14, ¶ 92), that does not support an inference that the detectives fabricated the statements or coerced Wilson or Condison to sign them; rather, it describes the normal process by which detectives take statements from complainants and witnesses for purposes of making an arrest and for prosecution.

[9] An officer's "motivation to arrest [the] plaintiff is irrelevant to the question of probable cause." *Lee v. Sandberg*, 136 F.3d 94, 103 n.5 (2d Cir. 1997).

[10] N.Y. Penal Law § 240.30(1)(a) prohibits "communicat[ing] [threatening messages], *anonymously or otherwise*, by telephone." N.Y. Penal Law § 240.30(1)(a) (emphasis added).

affirmed that she knew the messages "were from [Plaintiff] because he made numerous references about [Condison's] friend [Wilson]," and because Plaintiff had sent Condison other anonymous texts "threatening to ruin [her] life and break up [her] relationship with [Gopaul]." (Am. Compl., Dkt. 14, ¶ 61.) The evidence that Plaintiff sent the texts was Condison's description of their content and the surrounding circumstances, not the originating phone number.

Plaintiff next challenges Defendants' reliance on Condison's statement on the ground that, after Plaintiff's arrest, Condison told prosecutors that she did not know that Plaintiff was the person who had stalked her in his car and sent her the text messages, and "that it was Defendant Bernhardt who had drafted those allegations and had her sign it so that [Defendant] could be arrested." (Pl. Opp., Dkt. 20, at 2.) Again, however, "the probable-cause-to-arrest inquiry is generally limited to whether the facts known by the arresting officer *at the time of the arrest* objectively provide probable cause to arrest." *Pabon*, 871 F.3d at 176 n.5 (emphasis added). Condison gave a signed statement to Defendant Bernhardt in which she attested: "I received approximately one hundred and fifty text messages that I know were from [Plaintiff]." (Am. Compl., Dkt. 14, ¶ 61.) This is the information Defendants had when Mazzura and Gomez arrested Plaintiff. "The actual accuracy or veracity of [Condison's] statement is irrelevant . . . ." *See Escalera v. Lunn*, 361 F.3d 737, 745 (2d Cir. 2004). That Condison allegedly recanted aspects of her statement *after* Plaintiff's arrest thus is immaterial.

Nor, as noted, does Plaintiff allege that Defendant Bernhardt coerced Condison to sign her statement. Although Plaintiff asserts that Bernhardt "drafted" the statement and "had [Condison] sign," the word "had" does not amount to an allegation of coercion, given that the statement was in Bernhardt's possession when he drafted it, and Condison needed to sign as a logistical matter. As previously discussed (*supra* note 7), "having" a witness sign her statement is the normal process

for taking and memorializing such statements for later use to arrest and prosecute a suspect. Coercion cannot be plausibly inferred from the mere allegation that a detective "had [a witness] sign" her statement.  If Plaintiff, in good faith, could allege that Defendant Bernhardt actually *coerced* Condison into signing a statement he knew to be false, more was required than that Bernhardt "had her sign." *Cf. Stansbury v. Wertman*, 721 F.3d 84, 91 n.7 (2d Cir. 2013) ("Because there is no suggestion that [the witnesses were] coerced into identifying the plaintiff, or that [the defendant] thought either witness had any motive to lie, we conclude that the identification procedures employed here—although highly improper—were not so flawed that they could not contribute to a finding of probable cause."); *Demosthene v. City of New York*, No. 18-CV-1358 (ARR) (PK), 2019 WL 2436681, at *2 (E.D.N.Y. June 11, 2019) (declining to dismiss a false arrest claim where, unlike here, the "[p]laintiff allege[d] that [the witness's] statement was the result of pressure and coercion from the officers, and did not represent the truth").

Plaintiff next contends that Defendant Thomas fabricated Wilson's statement that she "knew" Plaintiff sent her threatening texts.  Plaintiff points out that Wilson's statement originally said she "believed that these text messages [came] from [Plaintiff]," but that the word "believed" was later crossed out and replaced by the word "know," so the statement would read, "I ~~believed~~ know that these text messages [came] from [Plaintiff]."  (*See* Pl. Opp., Dkt. 20, at 3; Am. Compl., Dkt. 14, ¶ 63.)  According to Plaintiff, this suggests that "Defendant Thomas [] drafted [Wilson's] statement in such a way that it contained statements that Defendant Thomas knew were false." (*See* Pl. Opp., Dkt. 20, at 3.)  The Court disagrees.

First, Plaintiff does not allege that Defendant Thomas changed the word "believed" to "know" *after* Wilson signed the statement.  And the Amended Complaint alleges no facts to suggest that Wilson was unaware of the change or opposed it.  Again, the Amended Complaint

16

does not allege that Thomas forged Wilson's signature or coerced Wilson into signing the statement.  Rather, as noted, Wilson expressly affirmed: "I am giving this statement to Detective Thomas who wrote it for me and it is the truth."  (Am. Compl., Dkt. 14, ¶ 63.)  The edit of "believed" to "know" thus is attributable to Wilson, because there is no allegation that Thomas or any other Defendant made the change after Wilson affirmed the statement's truth, and thus there is no basis to plausibly infer that Thomas doctored or falsified Wilson's statement in this regard.

Second, the replacement of "believed" with "know" is semantic and has almost no bearing on whether Defendants had probable cause.  A witness's identification of an alleged perpetrator always is that witness's "belief," regardless of how the witness characterizes it.  That is, a person's "knowledge" is necessarily based on her "belief" about what is real, true, or correct.  Even to the extent that "belief" might convey less certainty than "knowledge," what matters for purposes of making a probable cause determination is what that belief or knowledge is based on.  For example, if Wilson had said, "I *know* the person threatening me was Plaintiff because Plaintiff speaks English and the texts were in English," that would not provide probable cause despite the word "know."  But if Plaintiff had said, "I *believe* the person threatening me was Plaintiff because I saw Plaintiff send the texts, and he later told me he sent them," that would provide probable cause, despite the word "believe."

More important than Wilson's word choice are the reasons she gave for "believing" or "knowing" Plaintiff sent the threatening texts.  Wilson "knew"—or "believed"—that the "text messages [came] from [Plaintiff] because of the way he's saying in the text [sic]," the language used in similar messages sent to Condison, Wilson's receipt of a similar message that Condison "told [her] was from [Plaintiff]," and because the messages referenced circumstances pertinent to Plaintiff—*e.g.*, Plaintiff's apparent impression that Condison and Wilson had plotted to "use him

17

for material things." (*See* Am. Compl., Dkt. 14, ¶ 63 ("[Condison] told me it was u [Wilson] who came up with the whole idea of plain [sic] me.").)  Further, the texts expressly threatened Gopaul as well as Wilson and Condison.  (*See id.* ("It's u [Wilson], [Gopaul], [Condison] & whoever else I decide to clip.").)  This suggests that Plaintiff sent the texts, because Gopaul introduced Plaintiff to Wilson and Condison, and the four of them spent time together.  (*See id.* ¶ 33).  It also belies the theory that Gopaul, the only other conceivable suspect, was the sender.  Finally, the texts said, "remember Riggs 215," which is the college dorm where Plaintiff spent time with Wilson.  (*See id.* ¶¶ 33, 63.)  Defendants thus had legitimate reasons to suspect that Plaintiff sent the threatening texts, regardless of the word Wilson used to describe her level of confidence.  *Cf. Keith v. City of New York*, 641 F. App'x 63, 66 (2d Cir. 2016) (summary order) (noting that "there [was] no reason to believe that the victim was using the phrase 'looked like' to communicate uncertainty," and, anyway, a "witness's identification of a perpetrator" need not be "made with complete certainty").

In sum, Defendants had "sufficient [information] to warrant a person of reasonable caution in the belief that" Plaintiff had engaged in stalking in the fourth degree and aggravated harassment in the second degree, in violation of New York Penal Law §§ 120.45(1) and 240.30(1)(a), respectively.[11]   *See Betts*, 751 F.3d at 82.  This is true even if the theoretical possibility that someone else sent the messages is "consistent with the facts alleged."  *See United States v. Weaver*,

---

[11] The Court further notes that while Plaintiff challenges the statements of Wilson and Condison taken by Defendants Bernhardt and Thomas, the complainants gave similar statements to the LIU Safety Department shortly before Plaintiff's arrest and, according to the Amended Complaint, Defendants had "copies of those statements" before arresting Plaintiff in April 2018. (Am. Compl., Dkt. 14, ¶ 59.)

9 F.4th 129, 149 n.74 (2d Cir. 2021) (*en banc*) ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause.").[12]

### III.    Unreasonable Search

Plaintiff alleges that Defendants deprived him of his Fourth and Fourteenth Amendment rights by searching him in connection with his arrest.

#### A.    Legal Standard – Search

"The Fourth Amendment provides that 'the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause.'" *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting U.S. Const. amend. IV).   "[A] search incident to an arrest 'constitutes an exception to the warrant requirement' the Fourth Amendment otherwise imposes." *Sloley v. VanBramer*, 945 F.3d 30, 37 (2d Cir. 2019) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)). "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; *that intrusion being lawful*, a search incident to the arrest requires no additional justification." *Virginia v. Moore*, 553 U.S. 164, 177 (2008) (emphasis in original).

---

[12] As previously noted, as to Mazzara and Gomez, the Amended Complaint alleges only that they "drove to [Plaintiff's] home in Queens, New York, and placed him under arrest." (Am. Compl., Dkt. 14, ¶ 67.)   In effecting Plaintiff's arrest, Mazzara and Gomez are presumed to have the same knowledge establishing probable cause as their fellow officers based on the collective knowledge doctrine, and there are no allegations suggesting these two had reason to doubt the witness statements at the time of the arrest. *See Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) ("An arrest is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").

### B.       Plaintiff Fails to Adequately Allege an Unconstitutional Search

As discussed, Plaintiff's arrest was lawful because Defendants had probable cause.  Thus, "*that intrusion being lawful*," Defendants' search of Plaintiff incident to his arrest "require[d] no additional justification."  *See id.*  Plaintiff's unconstitutional search claim therefore must be dismissed for the same reasons as his false arrest claim.

## IV.    Malicious Prosecution

Plaintiff alleges that Defendants deprived him of his Fourth and Fourteenth Amendment rights by maliciously prosecuting him for the alleged conduct leading to his arrest.

### A.       Legal Standard – Malicious Prosecution

"Malicious-prosecution claims essentially allege a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure, the touchstone of which is reasonableness."  *Smalls v. Collins*, 10 F.4th 117, 132 (2d. Cir. 2021).  Like false arrest claims, "claims for malicious prosecution under § 1983 are substantially the same as claims for malicious prosecution under state law," except that a Section 1983 claimant must further "show a seizure or other perversion of proper legal procedures implicating his personal liberty and privacy interests under the Fourth Amendment."  *Lanning v. City of Glens Falls*, 908 F.3d 19, 24–25 (2d Cir. 2018).[13]  Under New York law, a plaintiff alleging malicious prosecution must show that "(1) the defendant initiated a prosecution against [the] plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in [the] plaintiff's favor."  *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016).

---

[13] Because "federal law defines the elements of a § 1983 malicious prosecution claim, . . . a State's tort law serves only as a source of persuasive authority rather than binding precedent in defining these elements."  *Lanning*, 908 F.3d at 25.  By contrast, "for malicious prosecution claims brought under New York law, federal courts must faithfully apply New York tort law."  *Id.* at 28.

"The 'essence' of [a malicious prosecution] claim is the alleged groundless prosecution." *Smalls*, 10 F.4th at 132. "A favorable termination of the underlying criminal proceeding indicative of innocence is therefore necessary to establish a viable claim because, absent an affirmative indication that the person is innocent of the offense charged, the government's failure to proceed does not necessarily imply a lack of reasonable grounds for the prosecution." *Id.* at 132–33.[14] A claimant's "acceptance of an ACD bars a malicious-prosecution claim because it leaves the question of innocence or guilt unanswered and is thus not a termination indicative of innocence." *Id.* at 143.

Further, "malicious prosecution claims under both New York and federal law require that a plaintiff prove the defendant lacked probable cause to prosecute." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021). "Probable cause, in the context of malicious prosecution, has been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Id.* "Although probable cause to prosecute is a complete defense to a claim of malicious prosecution, such probable cause must be shown as to each crime charged in the underlying criminal action." *Id.* "Thus, probable cause to prosecute should not be conflated with probable cause to arrest." *Id.* Finally, "malice can be inferred when a plaintiff is prosecuted without probable cause." *Rentas*, 816 F.3d at 221.

---

[14] The Supreme Court recently heard argument over whether the "affirmative indication of innocence" standard is appropriate in the malicious prosecution context. *See Thompson v. Clark*, 141 S. Ct. 1682 (2021) (granting certiorari on the question of "[w]hether the rule that a plaintiff must await favorable termination before bringing a Section 1983 [malicious prosecution claim] requires the plaintiff to show that the criminal proceeding against him has 'formally ended in a manner not inconsistent with his innocence,' or that the proceeding 'ended in a manner that affirmatively indicates his innocence'" (first quoting *Laskar v. Hurd*, 972 F.3d 1278, 1293 (11th Cir. 2020), then quoting *Lanning*, 908 F.3d at 22)).

### B.      Plaintiff Fails to Adequately Allege Malicious Prosecution

Plaintiff "concede[s] that his acceptance of an [ACD] as to the stalking in the fourth degree means that he cannot sustain a claim for malicious prosecution related to that charge."  (Pl. Br., Dkt. 20, at 7.)  The court also finds his malicious prosecution claim as to the aggravated harassment charge foreclosed because Defendants had probable cause to arrest Plaintiff and that probable cause extended into the prosecution.

Plaintiff argues that evidence discovered after the arrest defeated probable cause to prosecute.  Plaintiff points out that, after his arrest, Defendants did not find any "apps on [his] phone that would allow him to text or call from a different number" (Am. Compl., Dkt. 14, ¶ 73), but they did find texts from Gopaul to Plaintiff saying that Gopaul had access to Condison's email account, and:

- "in reference to Wilson, that he was going to 'bring this thot down... I'm about to spam her phone... [w]ith so much fake number[.]"

- "in reference to Wilson, "I told you... I'm destroying her" and "I say we kidnap her".

- "I'm telling u we need a dump her body... [i]n the lake...[a]nd call it a day"

- "I know there door room codes"

- "I cud end Elena and keyonna if I wanted too"

- "I cud ruin elena especially"

- "I got [Elena's] LIU account"

- "I can drop all [of Elena's] classes and make her have to pay the 26k Tuition instead of financial aid... [t]hat's how bad it can get"

(*Id.* ¶ 75 (annotations in Amended Complaint).)  Plaintiff also notes that his fingerprints were not on a camera Defendants recovered "from outside of the dorm at LIU."  (*Id.* ¶¶ 77–79.)  Plaintiff

characterizes this evidence as "clearly show[ing] that Gopaul was the person sending the anonymous texts, was hacking the various accounts, and was the person stalking Condison." (*Id.* ¶ 74.)

But while this evidence might incriminate Gopaul *also*, there was, as noted, other evidence that Plaintiff, not Gopaul, was the one stalking Condison and sending threatening texts. For example, Wilson attested that the texts expressly threatened Gopaul as well as Wilson and Condison. (*See id.* ¶ 63 (recounting a text saying, "It's u [Wilson], [Gopaul], [Condison] & whoever else I decide to clip.").) And Condison attested that she received texts "threatening to ruin [her] life *and break up* [*her*] *relationship with* [*Gopaul*]." (*Id.* ¶ 61 (emphasis added).) This suggests that Plaintiff, not Gopaul, sent at least some of the messages. Thus, Plaintiff's "purportedly exculpatory" evidence is "insufficient to vitiate probable cause." *See Ward v. City of New York*, No. 15-CV-4175 (CBA) (ST), 2018 WL 1603873, at *6 (E.D.N.Y. Mar. 31, 2018). Plaintiff's malicious prosecution claims therefore must be dismissed.

## V.     Fabrication of Evidence

Plaintiff alleges that Defendants deprived him of his Fourth and Fourteenth Amendment rights by fabricating evidence related to his alleged conduct leading to his arrest.

### A.     Legal Standard – Fabrication of Evidence

To establish a section 1983 fair-trial claim based on fabrication of evidence, a plaintiff must demonstrate that: (1) an investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result. *Smalls*, 10 F.4th at 132. "To succeed on a claim for a denial of the right to a fair trial against a police officer based on an allegation that the officer falsified information, an arrestee must therefore prove by a preponderance of the

evidence that the officer created false information, the officer forwarded the false information to prosecutors, and the false information was likely to influence a jury's decision." *Id.* "The plaintiff need not have been tried to make out this claim so long as some deprivation of liberty occurred." *Ashley*, 992 F.3d at 138.

A plaintiff cannot "bring his fabricated-evidence claim under § 1983 prior to favorable termination of his prosecution." *McDonough v. Smith*, 139 S. Ct. 2149, 2156–57 (2019). But "[i]n contrast to malicious prosecution claims, which require a plaintiff to demonstrate that the underlying criminal proceeding ended in a manner that affirmatively indicates his innocence[,] . . . Section 1983 liability attaches for knowingly falsifying evidence even where there simultaneously exists a lawful basis for the deprivation of liberty that the plaintiff suffered. *Smalls*, 10 F.4th at 132. In the context of fabricated evidence claims, "[t]he dismissal of [a plaintiff's] charges pursuant to an ACD [] constitute[s] a favorable termination within the meaning of *McDonough* and *McDonough* poses no bar to suit." *Id.* at 144. Thus, a plaintiff's fabricated evidence "claim accrues (and may be brought) once her charges are conclusively dismissed pursuant to an ACD." *Id.*

Further, "[a] section 1983 fair-trial claim . . . will not be defeated by evidence of probable cause because it covers kinds of police misconduct not addressed by malicious prosecution claims and vindicates a different constitutional right – the right to due process protected by the Fifth and Fourteenth Amendments." *Id.* at 133. Finally, a plaintiff "may assert a fabricated-evidence claim related to his pretrial detention under the Due Process Clause." *Id.* at 141.

### B.    Plaintiff Fails to Adequately Plead Fabrication of Evidence

Plaintiff fails to adequately plead his fabrication of evidence claim because he has not sufficiently alleged that Defendants Bernhardt and Thomas fabricated information. Although the

Amended Complaint alleges that "[t]he individual defendants conspired to massage Wilson's and Condison's statements to make it appear that they knew that [Plaintiff] was the person behind" the asserted events (*see* Am. Compl., Dkt. 14, ¶ 60), the Amended Complaint provides no factual support for this theory.  In fact, the Amended Complaint directly contradicts Plaintiff's argument. *See DPWN Holdings (USA), Inc.*, 747 F.3d at 151–52 ("Although factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint.").  As noted, Condison and Wilson signed the allegedly fabricated witness statements and attested that they were true.  Plaintiff does not allege that Defendants coerced Condison or Wilson to give the statements or sign.[15]  Nor does Plaintiff allege that the signatures were forged.  With no allegation of coercion or forgery, the statements are the words of Condison and Wilson; they are not the words of Bernhardt and Thomas, let alone fabrications, even if Condison and Wilson later gave inconsistent statements, or sought to recant their earlier statements to the detectives.  *Cf. Bellamy v. City of New York*, 914 F.3d 727, 748 (2d Cir. 2019) (concluding that a factual dispute existed concerning fabrication of a witness statement because, unlike here, the detective who drafted the statement "concede[d] that [the witness] refused to sign the statement" and "swore that she refused to sign the statement because, in her view and consistent with her repeated statements to the detectives, it was not true").

Thus, Plaintiff has failed to sufficiently allege a fair trial claim against any Defendant and that claim must be dismissed.

---

[15] Nor, as previously discussed, does the Court find that Plaintiff's allegations that Defendants Bernhardt and Thomas "had" Wilson and Condison sign their statements support a plausible inference of coercion.

## VI.    Failure to Intervene

Plaintiff alleges that various Defendants failed to intervene to prevent his alleged constitutional deprivations.

### A.    Legal Standard – Failure to Intervene

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Sloley*, 945 F.3d at 46–47.  "An officer who fails to intercede in the use of excessive force or another constitutional violation is liable for the preventable harm caused by the actions of other officers." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014).  "Whether the officer had a realistic opportunity to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* at 244.  When "there have been no violations of [the plaintiff's] constitutional rights, . . . it necessarily follows that the defendants cannot be liable for their failure to intercede in such non-existent violations." *McIntosh v. City of New York*, 722 F. App'x 42, 46 (2d Cir. 2018) (summary order).

### B.    Plaintiff Does Not Adequately Allege Failure to Intervene

As noted, Plaintiff has not adequately alleged that any Defendant violated his constitutional rights.  "[I]t necessarily follows that . . . [D]efendants cannot be liable for their failure to intercede in such non-existent violations."  *Id.*  Plaintiff's failure to intervene claims therefore must be dismissed.

## VII.   Municipal Liability

Plaintiff alleges that Defendant Nassau County caused his alleged constitutional deprivations through its policies, customs, and practices.

"Although § 1983 subjects only 'persons' to liability," the 1978 Supreme Court case, *Monell v. Department of Social Services*, "established that a municipality . . . is a person within the meaning of Section 1983." *Bellamy*, 914 F.3d at 756. "To establish liability under *Monell*, a plaintiff must show that he suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *Id.*. Where a plaintiff "has not plausibly alleged an underlying constitutional violation, his *Monell* claims against the municipal defendants necessarily fail." *Lanning*, 908 F.3d at 30.

As noted, Plaintiff does not adequately plead any constitutional violations. Thus, "his *Monell* claims against the municipal defendants necessarily fail." *See id.*

## CONCLUSION

Defendants' motion to dismiss is granted in its entirety, and the Amended Complaint is dismissed. The Clerk of Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated:  March 29, 2022
        Brooklyn, New York